**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TAMMIE WANLESS, et al., | No.  2:23-CV-00405-DMC |
| Plaintiffs, | |
| v. | <u>ORDER</u> |
| PELOTON INTERACTIVE, INC., | |
| Defendant. | |

Plaintiffs Tammie and Mike Wanless, who are proceeding with retained counsel, bring this civil action.  All parties have consented to Magistrate Judge jurisdiction and the case has been reassigned.  <u>See</u> ECF Nos. 7, 8, & 10.  Pending before the Court is Defendant's motion to compel arbitration.  <u>See</u> ECF No. 15.  The parties appeared before the undersigned on June 7, 2023, for a hearing.  Plaintiffs' counsel appeared in person.  Defense counsel appeared remotely via Zoom.  At the conclusion of the hearing, the matter was submitted for issuance of a formal order.

For the reasons discussed below, the Court will grant Plaintiffs' motion insofar as Plaintiffs' action will be referred to arbitration with respect to Mrs. Wanless's claims and stayed as to Mr. Wanless's claim for loss of consortium.  The parties will be directed to submit periodic joint reports on the status of arbitration proceedings.

/ / /

1   **I. BACKGROUND**

2   A.      <u>**Plaintiffs' Allegations**</u>

3           Plaintiffs allege that, around January 21, 2021, "after completing a ride on her

4   Peloton Bike,"[1] Mrs. Wanless "stepped off her bike and onto the floor wearing her Peloton

5   cycling Shoes." ECF No. 1, pg. 10.  Plaintiff contends that, because "her cycling shoes have no

6   grips and are made of slippery plastic," Mrs. Wanless slipped and sustained injuries as a result of

7   her fall.  <u>Id.</u>  Mrs. Wanless asserts that, "instead of returning to the Peloton bike," she went to the

8   hospital where she received medical attention and underwent surgery to repair those injuries

9   allegedly sustained as a result of her fall.  ECF No. 17, pg. 4.  Plaintiffs contend the shoes are

10  defective because they "have no grips and are made of slippery plastic," and, had she been

11  aware of this defect, she would have removed her shoes prior to dismounting from her bike. <u>See</u>

12  ECF No. 1 pg. 10.  Mr. Wanless is claiming loss of consortium because Mrs. Wanless is

13  allegedly unable to perform the "necessary marital, child-rearing and domestic duties" or the

14  "work and services usually performed by her in the care, maintenance and management of

15  Plaintiff's family home."  <u>Id.</u>, pgs. 19-20.

16          Plaintiffs assert claims for strict liability for manufacturing and/or design defect,

17  strict liability for failure to warn, negligence, and loss of consortium.[2]  <u>See</u> ECF No. 1, pg. 1.

18  B.      <u>**The Terms and Services Agreement**</u>

19          In order to become a member of Peloton's online fitness community, individuals

20  must create a Peloton account and agree to Peloton's Terms of Service.  <u>See</u> ECF 15-3, pgs. 2,

21  22-26.  When registering for a Peloton account, individuals are required to agree to Peloton's

22  Terms of Service, Privacy Policy, and Membership Terms as a condition of creating an account.

23  <u>See id.</u>  No user can complete the process of registering for a Peloton account without clicking a

24  button acknowledging that "I have read and agree to the Peloton Terms of Service, Privacy

25  Policy, and Membership Terms."  <u>Id.</u>, pgs. 4, 22-26.  The phrases "Terms of Service," "Privacy

26  ───────────────

27  [1] However, Plaintiffs state in opposition to Defendant's motion that "as the class was
    starting" she "pressed the touchscreen to stop the class and completely stepped off the Peloton
    bike and onto the floormat." ECF No. 17, pg. 4.

28  [2] Plaintiffs' fourth claim for loss of consortium is brought only by Mr. Wanless.

Policy," and "Membership Terms" are called out in underlined text and hyperlink such that the documents can be downloaded for review.  Id.  Peloton's Terms of Service[3] states that:

> [Peloton] provides an online fitness community and related products, services, content and features through Peloton websites, such as those for our studio, support, boutique, and local country pages (the **"Peloton Site(s)"**), the interfaces on tablets connected to Peloton fitness equipment (such as the Peloton Bike, Peloton Tread, and Peloton Row), Peloton's fitness studios, and through mobile, desktop, or device applications (including iOS and Android applications (**"Apps"**)) and Peloton-controlled social media pages (including on Facebook, Instagram, Spotify and Twitter). To make these Terms easier to read, the Peloton Sites and Apps, along with the Peloton tablet and studio interfaces and Peloton-controlled social media pages are collectively called the **"Peloton Service"** or **"the Services"**.  By registering as a member or by visiting, browsing, or using the Peloton Service in any way and have your usual residence in the US or Canada, you (as a "user") accept and agree to be bound by these Terms of Service (**"Terms"**), which forms a binding agreement between you and Peloton.

ECF No. 15-3, pg. 30 (Preamble) (emphasis in original).

As part of a user's acceptance of Peloton's Terms of Service, Peloton members agree to arbitrate any disputes with Peloton. See id. In fact, the first paragraph of the Terms of Service that applied when Mrs. Wanless created her Peloton account, stated: "[b]y registering as a member or by visiting, browsing, or using the Peloton Service in any way . . . you (as a 'user') accept and agree to be bound by these Terms of Service ('Terms'), which forms a binding agreement between you and Peloton." Id.  The Terms also state that "[i]f you do not wish to be bound by these Terms, you may not access or use the Peloton Service." Id.  It also states that: "[t]hese Terms begin on the date you first use the Peloton Service and continue as long as you have an account with us and/or continue to use the Peloton Service." Id., pg. 31.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[3] Peloton's Terms and Services Agreement is referenced herein as "Terms," "Terms of Service," or "the Agreement."

Additionally, the Terms make clear that they contain a binding arbitration provision and class action waiver for any dispute with Peloton and are called out in all caps lettering on the first page of the Agreement.  Id., pg. 30.  The provision reads:

> **PLEASE READ: THESE TERMS CONTAIN A BINDING ARBITRATION PROVISION AND CLASS ACTION WAIVER (SECTION 20). READ CAREFULLY, INCLUDING YOUR RIGHT, IF APPLICABLE, TO OPT OUT OF ARBITRATION. EXCEPT FOR CERTAIN TYPES OF DISPUTES DESCRIBED IN SECTION 20 BELOW, OR WHERE PROHIBITED BY LAW, BY ENTERING INTO THESE TERMS YOU EXPRESSLY AGREE THAT DISPUTES BETWEEN YOU AND PELOTON WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION, AND YOU HEREBY WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.**

Id. (Preamble) (emphasis in original).

Finally, the Agreement contains an arbitration provision, again in bold and called out in all caps lettering, that begins "**ARBITRATION REQUIREMENT & CLASS ACTION WAIVER – IMPORTANT – PLASE REVIEW AS THIS MAY AFFECT YOUR LEGAL RIGHTS, APPLICABLE TO THE FULL EXTENT PERMITTED BY LAW,**" and states:

> **Mandatory Arbitration of Disputes**. We each agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services or Content (collectively, "Disputes") will be resolved solely by binding, individual arbitration and not in a class, representative or consolidated action or proceeding. You and Peloton agree that the U.S. Federal Arbitration Act (or equivalent laws in the jurisdiction in which the Peloton entity that you have contracted with is incorporated) governs the interpretation and enforcement of these Terms and that you and Peloton are each waiving the right to a trial by jury or to participate in a class action. The arbitration provision shall survive termination of these Terms.

ECF No. 15-3, pg. 37 (emphasis in original).

> In addition, you will retain the right to opt out of arbitration entirely and litigate any Dispute if you provide us with written notice of your desire to do so by regular mail sent to the attention of Peloton's Legal Department at the Peloton address  . . . within 30 days following the date you first agree to these Terms.

Id. (Exceptions and Opt-Out).

/ / /

/ / /

/ / /

4

**Conducting Arbitration and Arbitration Rules**: Any arbitration will be conducted by JAMS pursuant to its Streamlined Arbitration Rules and Procedures (the "JAMS Rules") then in effect, except as modified by these Terms. The JAMS Rules are available at www.jamsadr.com or by calling 1-800-352-5267. . . .

Id. (emphasis in original).

The parties agree that the arbitrator shall have exclusive authority to decide all issues relating to the interpretation, applicability, enforceability and scope of this arbitration agreement.

Id. (Section 20, ¶ 5).

Mrs. Wanless created her Peloton account on June 26, 2020, and agreed to the Terms at the time she purchased her Peloton Bike. ECF No. 15-3, pgs. 3-4, 28. Mrs. Wanless subsequently agreed to updated versions of Peloton's Terms on August 14, 2022, and September 20, 2022.[4] See id. When agreeing to these updated Terms, Mrs. Wanless would have had to again click a button acknowledging that "I have read and agree to the Peloton Terms of Service, Privacy Policy, and Membership Terms," as she did on June 26, 2020. Id., pgs. 3-4, 22-26, 28.

## II. LEGAL STANDARD

Under the Federal Arbitration Act (FAA), agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2). The FAA provides that once a defendant files a motion to compel arbitration, a district court must "hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not at issue" must "make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. It "reflects both a 'liberal federal policy favoring arbitration' . . . and the 'fundamental principle that arbitration is a matter of contract.'" Kramer v. Toyota Motor Corp., 705 F.3d 1122, 1126 (9th Cir. 2013) (quoting AT&T Mobility, 563 U.S. at 339). "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that

---

[4] It is undisputed that there were no substantive changes in the arbitration provision between June 26, 2020 and September 20, 2022. See ECF No. 15-3, pg. 4.

district courts shall direct the parties to proceed to arbitration on issues as to which an

arbitration agreement has been signed" and "any doubts concerning the scope of arbitrable

issues should be resolved in favor of arbitration." <u>Dean Witter Reynolds Inc. v. Byrd</u>, 470 U.S.

213, 218 (1985); <u>Ferguson v. Corinthian Colls.</u>, Inc., 733 F.3d 928, 938 (9th Cir. 2013) (citation

and quotation marks omitted).

       The Supreme Court recently clarified that the FAA's "policy favoring arbitration"

does not authorize federal courts to invent "special, arbitration-preferring procedural rules" but,

instead, merely acknowledges the FAA's "commitment to overrule the judiciary's longstanding

refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as

other contracts." <u>Morgan v. Sundance, Inc.</u>, 142 S. Ct. 1708, 1713 (2022). (citation and quotation

marks omitted).  A court must hold a party to its arbitration contract just as it would any other

kind of contract, but may not devise "novel rules to favor arbitration over litigation." <u>See id.</u>  In

other words, there is no "strong federal policy favoring enforcement of arbitration agreements"

but the federal policy is to treat arbitration agreements like other contracts and enforce them

just like any other contract – but not more so.  <u>Armstrong v. Michaels Stores, Inc.</u>, 59 F.4th

1011, 1014 (9th Cir. 2023); <u>Morgan</u>, 142 S. Ct. at 1713.

       Generally, a court's role is limited to determining "two 'gateway' issues:

(1) whether there is an agreement to arbitrate between the parties; and (2) whether the

agreement covers the dispute." <u>Revitch v. DIRECTV, LLC</u>, 977 F.3d 713, 716 (9th Cir. 2020);

<u>Brennan v. Opus Bank</u>, 796 F.3d 1125, 1130 (9th Cir. 2015). Only if the court answers both

questions in the affirmative will the FAA require the Court "to enforce the terms of the arbitration

agreement in accordance with its terms." <u>Id.</u> But even these gateway issues can be submitted to

an arbitrator where there is clear and unmistakable evidence that the parties intended that result.

<u>See id.</u> "When the parties' contract delegates the arbitrability question to an arbitrator, a court

may not override the contract. In those circumstances, a court possesses no power to decide the

arbitrability issue." <u>Henry Schein, Inc. v. Archer & White Sales, Inc.</u>, 139 S. Ct. 524, 529

(2019). The Supreme Court has reminded that "courts should order arbitration of a dispute only

where the court is satisfied that neither the formation of the parties' arbitration agreement nor

6

(absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." <u>Granite Rock Co. v. Int'l Bhd. of Teamsters</u>, 561 U.S. 287, 299 (2010).

### III. DISCUSSION

As discussed below, the Court finds no valid agreement to arbitrate exists for Mr. Wanless.  As to Mrs. Wanless, because a valid agreement to arbitrate exists between Mrs. Wanless and Peloton, and that agreement expressly delegates to the arbitrator the authority to decide whether a claim falls within the scope of the arbitration provision. Accordingly, the Court grants Peloton's motion as to Mrs. Wanless only.  Because Mr. Wanless's claim of loss of consortium is based on Mrs. Wanless's claims of tort liability, the Court will issue a stay of these proceedings as to Mr. Wanless's claim.

### A.    <u>Mr. Wanless Did Not Agree to Arbitrate</u>

Peloton argues that even though Mr. Wanless is a non-signatory to the Terms of Service, he should be bound by the Arbitration Agreement due to the doctrine of equitable estoppel.  Despite the requirement of mutual assent for a valid contract, "non[-]signatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles," including the principles of equitable estoppel.  <u>Comer v. Micor, Inc.</u>, 436 F.3d 1098, 1101 (9th Cir. 2006) (citation and quotation marks omitted); <u>Tamsco Props., LLC v. Langemeier</u>, 597 F. App'x 428, 429 (9th Cir. 2015).

"Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." <u>Setty v. Shrinivas Sugandhalaya LLP</u>, 3 F.4th 1166, 1169 (9th Cir. 2021) (quoting <u>Mundi v. Union Sec. Life Ins. Co.</u>, 555 F.3d 1042, 1045 (9th Cir. 2009)). Generally, California cases binding non-signatories to an arbitration either involve one of two scenarios: first, a non-signatory might be required to arbitrate because the contract conferred a benefit on the non-signatory, making the non-signatory a third party beneficiary of the arbitration agreement. <u>Cty. of Contra Costa v. Kaiser Found. Health Plan, Inc.</u>, 47 Cal. App. 4th 237, 242 (1996); <u>see</u> <u>e.g.</u>, <u>Tice v. Amazon.com, Inc.</u>, No. 5:19-

cv-1311-SVW-KK, 2020 WL 1625782, at *1-2 (C.D. Cal. Mar. 25, 2020) (holding non-signatory equitably estopped from avoiding arbitration agreement due to non-signatory's voluntary use of product at issue), reversed on other grounds by Tice v. Amazon.com, Inc., 845 F. App'x 535, 537 (9th Cir. 2021).

Second, a preexisting relationship might exist between the non-signatory and one of the parties to the arbitration agreement, making it equitable to compel the non-signatory to arbitration. Contra Costa, 47 Cal. App. 4th at 242; see Teel v. Aaron's, Inc., No. 3:14-cv-640-J-32PDB, 2015 WL 1346846, at *7 (M.D. Fla. Mar. 24, 2015) (finding non-signatory equitably estopped because he was essentially trying to have his cake and eat it too when, on the one hand, he relied on the agreement's existence with respect to delivery of furniture infested with bed bugs and black mold in his claims against the defendant, but repudiated the arbitration provision, on the other hand).

The Court finds that the arbitration agreement does not apply to Mr. Wanless. Plaintiffs argue that Defendant fails to establish the formation of an agreement to arbitrate with Mr. Wanless. See ECF No. 17, pgs. 13-14. Peloton contends that "Mr. Wanless'[s] claim should be compelled to arbitration given the nature of his relationship with Ms. Wanless, and the policies in favor of combining loss of consortium claims with the underlying bodily injury claim." ECF No. 15-1, pg. 14. The Court does not find Peloton's argument persuasive.

Under the Terms, a user is defined as one who registers as a member or visits, browses, or uses the Peloton Service "in any way"; it is the user who accepts and agrees to be bound by the Terms, which forms the binding agreement with Peloton to arbitrate. There is no evidence presented that Mr. Wanless ever used the Peloton Service "in any way"; in fact, Defendant conceded as much during the hearing. Mr. Wanless signed a declaration submitted under penalty of perjury, stating that he has never (1) purchased any products from Peloton; (2) used any products from Peloton; (3) created an account or otherwise created a username or login for himself with Peloton; (4) accessed anyone else's Peloton account; or (5) entered into an

/ / /

/ / /

arbitration agreement with Peloton.[5]  See ECF No. 17-3, pg. 2.

There are no facts to warrant applying the principles of equitable estoppel in this case to force Mr. Wanless, a non-signatory to Peloton's Terms of Service, to arbitrate claims when he has never used or benefited from Peloton.  Further, Mr. Wanless's claim for loss of consortium does not depend on any terms contained in the Agreement.  It is undisputed that Mr. Wanless's claim for loss of consortium relates to Mrs. Wanless's claims for negligence and product liability, but neither claims are based on any allegation related to the Terms of the Agreement.  See Teel, 2015 WL 1346846, at *7.  Thus, Peloton's motion as to Mr. Wanless is denied.

**B.      Mrs. Wanless Entered into a Valid Arbitration Agreement with Peloton**

In order to compel Mrs. Wanless to arbitrate her claims, Peloton must show that she manifested mutual assent to the Agreement containing the arbitration provision.  Although the Internet has introduced new twists with regard to entering into contracts, the fundamental elements of contract law are still required, including mutual assent. That being said, "[m]utual assent does not require that the offeree have actual notice of the terms of an arbitration agreement." Dohrmann v. Intuit, Inc., 823 F. App'x 482, 483 (9th Cir. 2020). "Instead, an offeree is bound by an arbitration clause if 'a reasonably prudent Internet consumer' would be put on 'inquiry notice' of the 'agreement's existence and contents.'" Id.; see also Meyer v. Uber Techs., Inc., 868 F.3d 66, 74-75 (2d Cir. 2017) ("Where there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms.").

Courts have shown a "tolerance for the single-click 'Sign Up' and assent practice" and held that a "modified or hybrid clickwrap/browsewrap agreement constitutes a binding contract where the user is provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I Accept' button and clicks that button." See In re

---

[5] While Defendant argues in its motion that Mr. Wanless should be compelled to arbitrate his claims based on third-party beneficiary principles, Defendant abandoned this argument based on Mr. Wanless's declaration asserting that he never used any Peloton product. See ECF No. 18, pg. 5, n.1.

1  Facebook Biometric Info. Priv. Litig., 185 F. Supp. 3d 1155, 1166 (N.D. Cal. 2016) (citing

2  Crawford v. Beachbody, LLC, No. 14cv1583-GPC (KSC), 2014 WL 6606563, at *3 (S.D. Cal.

3  Nov. 5, 2014)). Further, it is of no consequence whether the consumer actually clicks a hyperlink

4  to read the terms containing the arbitration provision or not. See, e.g., Fteja v. Facebook, Inc., 841

5  F. Supp. 2d 829, 839-40 (S.D.N.Y. 2012) (holding when a consumer is prompted to examine

6  terms of sale located on another page available via hyperlink, "[w]hether or not the consumer

7  bothers to look is irrelevant" because "[f]ailure to read a contract before agreement to its terms

8  does not relieve a party of its obligations under the contract"); Oregon-Pac. Forest Prod. Corp. v.

9  Welsh Panel Co., 248 F. Supp. 903, 908 (D. Or. 1965) (providing that "[i]t is no defense that a

10  party, seeking to avoid the contract, did not read it").

11          Plaintiffs contend that Mrs. Wanless assented only to arbitrate those claims that

12  involved the use of services or content, not product liability claims; so there was no mutual

13  assent—without mutual assent, there is no contract.  According to Peloton when Mrs. Wanless

14  signed up for the Peloton account, she necessarily (1) was presented with a conspicuous hyperlink

15  to a full copy of the Terms of Services, including the arbitration provision, and (2) affirmatively

16  "checked the box" indicating that she agreed to the Terms of Service.

17          In order to become a member of Peloton's online fitness community, individuals

18  must create a Peloton account and agree to Peloton's Terms of Service.  See ECF 15-3, pgs. 2,

19  22-26.  When registering for a Peloton account, individuals are required to agree to Peloton's

20  Terms of Service, Privacy Policy, and Membership Terms as a condition of creating an account.

21  See id.  No user can complete the process of registering for a Peloton account without clicking a

22  button acknowledging that "I have read and agree to the Peloton Terms of Service, Privacy

23  Policy, and Membership Terms." Id., pgs. 4, 22-26.  The phrases "Terms of Service," "Privacy

24  Policy," and "Membership Terms" are called out in underline and hyperlink such that the

25  documents can be downloaded for review.  Id.

26  / / /

27  / / /

28  / / /

10

1    It is undisputed that Mrs. Wanless registered an account with Peloton and that she

2    failed to timely opt out of the arbitration provision.  It is also undisputed that Mrs. Wanless

3    repeatedly agreed on June 26, 2020, August 14, 2022, and September 20, 2022 via her home bike

4    platform to the Terms and Services.  See ECF No. 15-3, pg. 28.  By "checking a box" next to the

5    language "I confirm that I have read and agree to the Peloton Terms of Service, Privacy Policy,

6    and Membership Terms," Plaintiff assented to the Terms, and all its provisions. The Terms state

7    that "[b]y registering as a member or by visiting, browsing, or using the Peloton Service in any

8    way" the "user" "accept[s] and agree[s] to be bound by the Terms, which form "a binding

9    agreement between [the user] and Peloton." ECF No. 15-3, pg. 30.  Plaintiffs' counsel conceded

10   Mrs. Wanless would be considered a "user" within this context.  As a user, Mrs. Wanless also

11   agreed that "any dispute, claim or controversy" "arising out of" or "relating to" the use of the

12   Services would be resolved by arbitration.  ECF No. 15-3, pg. 37.

13   The phrases "arising out of" and "relating to" are broad in their application here.

14   Moreover, as the evidence shows, Mrs. Wanless was in the process of using Peloton's Services at

15   the time the purported injury occurred.  See 17-2, pg. 2.  Indeed, Mrs. Wanless asserted in her

16   declaration that "as the class was starting" she "pressed the touchscreen to stop the class and

17   completely stepped off the Peloton bike and onto the floormat." ECF No. 17, pg. 4.  Since the

18   ability to take a class with Peloton required Mrs. Wanless to create an account, which in turn

19   required her to assent to the Terms, her claims arise out of or relate to the language in the

20   arbitration provision.  As a result, Mrs. Wanless agreed that "any dispute, claim or controversy

21   arising out of or relating to these Terms," would be resolved solely by binding arbitration.

22   Hence, there is a valid arbitration agreement.

23   Because there is a valid arbitration agreement, the only unresolved issue is whether

24   Mrs. Wanless's claims fall within the scope of the arbitration provision. "[P]arties can agree to

25   arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate

26   or whether their agreement covers a particular controversy." Rent–A–Ctr., West, Inc. v. Jackson,

27   561 U.S. 63, 68-69 (2010). Where the parties to an arbitration agreement "clearly and

28   unmistakably" agree that an arbitrator will decide gateway issues, the arbitrator, rather than the

11

court, will decide those issues. AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986). "Such [c]lear and unmistakable evidence of agreement to arbitrate arbitrability might include . . . a course of conduct demonstrating assent . . . or . . . an express agreement to do so." Momot v. Mastro, 652 F.3d 982, 988 (9th Cir. 2011) (citations and internal quotation marks omitted).

"When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract" and "possesses no power to decide the arbitrability issue." Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019). This remains "true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." Henry Schein, 139 S. Ct. at 529; Tice v. Amazon.com, Inc., 845 F. App'x 535, 537 (9th Cir. 2021) (finding trial court erred by failing to compel all claims to arbitration because arbitration agreement stated "any dispute or claim relating in any way to . . . use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com" and "[a]ny dispute or claim arising from or relating to this Agreement or Alexa"; thus, it is for the arbitrator to decide whether claim is beyond the scope).

First, it is undisputed that Mrs. Wanless entered into an Agreement with Peloton on three separate occasions. Second, the Parties do not dispute that the arbitration provision contains an express delegation clause, which clearly and unmistakably delegates the job of interpreting the scope of the arbitration provision to the arbitrator. The Agreement specifically states that any arbitration "will be conducted by JAMS pursuant to its Streamlined Arbitration Rules & Procedures ('the JAMS Rules') then in effect, except as modified by these Terms." ECF No. 15-3, pg. 37. Rule 8(b) of the incorporated JAMS Streamlined Arbitration Rules & Procedures provides that, any jurisdictional and arbitrability disputes, including those "disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." ECF No. 15-2, pg. 9.

///

Third, the delegation clause contained in the Agreement expressly provides that "the arbitrator shall have exclusive authority to decide all issues relating to the interpretation, applicability, enforceability and scope of this arbitration agreement"; thus, it is clear and unmistakable from the text of the Agreement, that the arbitrator, not the Court, would resolve any questions of arbitrability, including whether Mrs. Wanless's claims fall within the scope of the arbitration provision.  As a result, the Court need not, and should not, determine those issues. Mrs. Wanless's arguments regarding the scope of the arbitration agreement may well render her claims unarbitrable; however, "under the contract, the parties clearly and unmistakably delegated this question to the arbitrator." Ratajesak v. New Prime, Inc., No. SA CV 18-9396-DOC (AGRx), 2019 WL 1771659, at *6 (C.D. Cal. March 20, 2019). Plaintiff can, and should, raise her challenges before the arbitrator.

Based on the language of the delegation provision in the Agreement, the Court finds that Mrs. Wanless and Peloton agreed to arbitrate gateway issues, including whether Mrs. Wanless's claims fall within the scope of the arbitration provision.

### C.   <u>Stay of Proceedings</u>

Where a plaintiff files suit "in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for . . . arbitration, the court in which such suit is pending, upon being satisfied that the issue . . . is referable to arbitration . . . shall on application of one of the parties stay the trial of the action until such arbitration." 9 U.S.C. § 3. A court's power to stay proceedings is incidental to the inherent power to control the disposition of its cases in the interests of efficiency and fairness to the court, counsel, and litigants. Landis v. N. Am. Co., 299 U.S. 248, 254-55 (1936). A stay may be granted pending the outcome of other legal proceedings related to the case in the interests of judicial economy. Leyva v. Certified Grocers of Cal., Ltd., 593 F.2d 857, 863-64 (9th Cir. 1979). Discretion to stay a case is appropriately exercised when the resolution of another matter will have a direct impact on the issues before the court, thereby substantially simplifying the issues presented. Mediterranean Enters., Inc. v. Ssangyong Corp., 708 F.2d 1458, 1465 (9th Cir. 1983). In determining whether a stay is appropriate, a court "must weigh competing interests and maintain an even balance." Landis, 299

1   U.S. at 254-55. "[I]f there is even a fair possibility that the stay . . . will work damage to someone

2   else, the stay may be inappropriate absent a showing by the moving party of hardship or

3   inequity." Dependable Highway Express, Inc. v. Navigators Ins. Co., 498 F.3d 1059, 1066 (9th

4   Cir. 2007) (citation and quotation marks omitted).

5            Here, even though Mr. Wanless's claim for loss of consortium is an independent

6   claim, it is also tangled with the claims of Mrs. Wanless:  Peloton, Mr. Wanless and Mrs.

7   Wanless are all parties to the instant matter, Mr. Wanless's loss of consortium claim arises out of

8   the same transaction or series of transactions as Mrs. Wanless's claims, which are subject to

9   arbitration, and if Mr. Wanless's loss of consortium claim is allowed to separately proceed, there

10  is a possibility that the district court will reach conflicting rulings from the arbitrator.  However,

11  Mr. Wanless is not bound to arbitrate his claims because as a non-signatory, a party cannot be

12  required to submit to arbitration any dispute which he has not agreed so to submit, and the

13  principle of equitable estoppel does not apply here.  Therefore, in the interests of judicial

14  economy, this Courts shall stay Mr. Wanless's claim for loss of consortium pending the outcome

15  of the arbitration proceeding on Mrs. Wanless's claims.

16

17                                   **IV.  CONCLUSION**

18           Accordingly, the Court orders as follows:

19           1.      Defendant's motion to compel arbitration, ECF No. 15, is granted in part

20  and denied in part.

21           2.      The Court grants Defendant's motion to compel arbitration as to Mrs.

22  Wanless's claims only and denies Defendant's motion to compel arbitration as to Mr. Wanless's

23  claim.

24           3.      The parties are ordered to submit Mrs. Wanless's claims to arbitration

25  pursuant to the arbitration provision in the Agreement.

26           4.      This action is stayed as to Mr. Wanless's claim for loss of consortium

27  pending resolution of the arbitration.

28  / / /

5.      The parties shall file a joint status report within 60 days of the date of this order, and a further report every 60 days thereafter.

Dated:  June 20, 2023

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE